**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| The Tohono O'odham Nation, | No. CV-11-279-PHX-DGC |
| Plaintiff, | **ORDER** |
| vs. | |
| The City of Glendale; and the State of Arizona, | |
| Defendants. | |

      The Tohono O'odham Nation purchased unincorporated land surrounded by the City of Glendale, asked the Department of the Interior to take the land into trust, and announced plans to construct and operate a major casino on the property.  In response, the Arizona Legislature passed House Bill 2534 on February 1, 2011.  The bill authorizes cities and towns within Arizona's three largest counties, which would include the City of Glendale, to use an expedited procedure to annex land surrounded or nearly surrounded by the city or town if the owner of the land has asked the federal government to take ownership of the land or to take the land into trust.  In this lawsuit, the Nation asks the Court to declare H.B. 2534 invalid and enjoin Glendale from using it to annex the Nation's land.  The parties have filed and briefed motions for summary judgment. Docs. 23, 28, 30, 31, 32.  The Court heard oral arguments on June 17, 2011.  Docs. 33, 35.  For reasons that follow, the Court holds that H.B. 2534 is preempted by federal law.

I.      **Background.**

In 1986, Congress enacted the Gila Bend Indian Reservation Lands Replacement Act (the "Gila Bend Act" or the "Act"), Pub. L. No. 99-503, 100 Stat. 1798 (Oct. 20, 1986).  The general purposes of the Act were to replace the Nation's reservation land that was destroyed by a federal dam, and otherwise to promote the Nation's economic self-sufficiency.  *Id.* § 2(4).  Pursuant to the Act, the Nation transferred 9,880 acres of reservation land to the United States in exchange for $30 million to purchase replacement land.  *Id.* §§ 4(a), 6(c).  Where certain requirements are met, the Act requires the Secretary of the Interior to take up to 9,880 acres of purchased land into trust for the benefit of the Nation, a step that would effectively make the purchased land part of the Nation's reservation.  *Id.* § 6(d).  One of the Act's requirements for trust acquisition is that the land not be within the corporate limits of any city or town.  *Id.*

In August 2003, the Nation purchased a 135-acre tract of land near 91st and Northern Avenues in Maricopa County.  The land is part of an unincorporated county island surrounded by the City of Glendale.  On January 28, 2009, the Nation announced plans to use the land for gaming purposes and filed with the Department of the Interior ("DOI") an application to have the land taken into trust under the Gila Bend Act.  Because gaming activities may take place on the land only if it is part of the Nation's reservation, having the land held in trust is a prerequisite to construction of the proposed casino.  If the land were to be annexed by Glendale, it may be ineligible for trust acquisition under the Act as it would be within Glendale's corporate limits.  The 135-acre tract will be referred to in the remainder of this order as "the Nation's land."

On March 12, 2010, due to an ongoing state-court lawsuit over whether Glendale previously had annexed a portion of the Nation's land identified in title documents as "Parcel 1," the Nation requested that DOI accept only "Parcel 2" in trust and hold the remainder of the application in abeyance pending resolution of the state-court case.[1]

---

[1] The Arizona Court of Appeals has now ruled in favor of the Nation.  *See Tohono*

Parcel 2 consists of 54 acres on the westernmost part of the Nation's land.  DOI issued its decision on July 23, 2010, concluding that the legal requirements for taking Parcel 2 into trust had been satisfied.  This Court upheld that decision in a related case.  *See Gila River Indian Community v. United States*, --- F. Supp. 2d ---, 2011 WL 826282 (D. Ariz. Mar. 3, 2011).  This ruling is on appeal.

The Nation's plans to build a casino have evoked vigorous opposition by Glendale, Arizona legislative and executive branch leaders, and others.  During the 2010 legislative session, the Arizona House of Representatives passed a bill that would have streamlined the process for a city or town to annex certain land.  The bill failed to pass the Senate before the legislative session ended.

H.B. 2534 was passed early in the next legislative session and signed into law on February 1, 2011.  The bill, codified at A.R.S. § 9-471.04, provides that "[a] city or town located in a county with a population of more than three hundred fifty thousand persons may annex any territory within an area that is surrounded by the city or town or that is bordered by the city or town on at least three sides if the landowner has submitted a request to the federal government to take ownership of the territory or hold the territory in trust."  A.R.S. § 9-471.04(A)(1).  For purposes of the statute, "submitted a request to the federal government" means the landowner "has made an application to the federal government as required by a specific federal statute or regulation."  A.R.S. § 9-471.04(B).  The annexation of land pursuant to H.B. 2534 "is valid if approved by a majority vote of the governing body of the city or town," and the annexation "becomes immediately operative if it is approved by at least two-third of the governing body of the city or town."  A.R.S. § 9-471.04(A)(2).  H.B. 2534 differs from Arizona's general annexation statute, A.R.S. § 9-471, which requires notice, a 30-day waiting period, a public hearing, and the consent of a majority of the landowners before annexation can occur.  H.B. 2534 will take effect on July 19, 2011.

---

*O'odham Nation v. City of Glendale*, --- P.3d ----, 2011 WL 1815963, at *3 (Ariz. Ct. App. May 3, 2011).  Glendale has sought review by the Arizona Supreme Court.

1    The Nation claims that H.B. 2534, as applied to the Nation's land, is preempted by

2    the Gila Bend Act, violates the Nation's due process and equal protection rights, and

3    violates the Arizona Constitution's prohibition against special legislation.  Doc. 1.

4    **I.      As-Applied Challenge.**

5          Defendants contend that because H.B. 2534 has not been applied to the Nation's

6    land, the Nation's as-applied challenge fails as a matter of law.  Doc. 28 at 11-12.[2]  The

7    Court does not agree.

8          The relevant inquiry is whether the Nation has presented a justiciable case or

9    controversy.  The Supreme Court made clear decades ago that an action for declaratory

10   relief can constitute a case or controversy under Article III of the United States

11   Constitution where it has "the essentials of an adversary proceeding, involving a real, not

12   a hypothetical, controversy[.]"  *Nashville, C. & St. L. Ry. v. Wallace*, 288 U.S. 249, 346-

13   49 (1933).    More recently, the Supreme Court reaffirmed the basic standard for

14   determining whether a claim for declaratory relief is justiciable:  "'whether the facts

15   alleged, under all the circumstances, show that there is a substantial controversy, between

16   parties having adverse legal interests, of sufficient immediacy and reality to warrant the

17   issuance of a declaratory judgment[.]'"  *MedImmune, Inc. v. Genentech, Inc.*, 546 U.S.

18   118, 127 (2007) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273

19   (1941)); *see also Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990) (to have

20   standing, the plaintiff "must have suffered, or be threatened with, an actual injury

21   traceable to the defendant and likely to be redressed by a favorable judicial decision").

22   The Nation's claim clearly satisfies this standard.

23         As noted above, Glendale strongly opposes the Nation's plans to build a casino

24   within its boundaries.  If the Nation's land is taken into trust, Glendale will lose all

25   authority to annex the land as well as its present control over the land's use.  Doc. 29

26   _____

27         [2] Citations to pages in the parties' briefs and other filings in the Court's electronic
     docket will be to page numbers applied to the top of each page by the electronic docket
28   system, not to page numbers at the bottom of each page.

¶ 21.  Contrary to Glendale's assertion (Doc. 32 at 7), the Nation's concern that Glendale will make every effort to annex the land under H.B. 2534 is based on more than unfounded speculation.

Glendale previously attempted to annex portions of the land, and that attempt was thwarted only after the Nation brought suit against the City in state court.  *See* Docs. 23, 24 ¶¶ 3; *Tohono O'odham Nation v. City of Glendale*, --- P.3d ----, 2011 WL 1815963 (Ariz. Ct. App. May 3, 2011).  In passing H.B. 2534, the Arizona legislature was well aware of the injuries Glendale would suffer if the land were to be held in trust.  Doc. 29 ¶ 32.  Glendale notes that a number of steps must take place before the land is annexed under H.B. 2534 (Doc. 32 at 7), but counsel for the City can provide no assurance that annexation will not occur given that "Glendale's representatives do not have the power to bind the City Council from undertaking legislative acts" (Doc. 27 ¶ 9).

Moreover, this is one of three federal lawsuits concerning the Nation's plan to construct a casino.  Glendale is a plaintiff in two of those actions – this case and *Gila River Indian Community, et al. v. United States*, CV10-1993-PHX-DGC.  The lawsuits are hard-fought and the issues fully joined.  The Court has issued merits decisions in both related cases, expressly concluding that the issues presented by the Nation's casino plans are ripe for judicial review.  *See Arizona v. Tohono O'odhom Nation*, No. CV11-0296-PHX-DGC, 2011 WL 2357866, at *4-6 (D. Ariz. June 15, 2011).

In short, the Court has no doubt that Glendale will use every available legal means to block the Nation's planned casino, including the annexation powers granted by H.B. 2534.  The controversy presented by this case is of "sufficient immediacy and reality" to present justiciable claims on the validity of H.B. 2534.  *MedImmune*, 546 U.S. at 127.

Defendants' reliance on *Nordyke v. King*, 319 F.3d 1185 (9th Cir. 2003), is misplaced.  In making a First Amendment challenge to an ordinance banning the possession of firearms on county property, the plaintiffs in *Nordyke* relied on "hypotheticals and examples" to illustrate that gun possession is speech.  319 F.3d at

1189.  The Nation's challenge to H.B. 2534 is premised not on hypothetical situations, but on the very real threat that Glendale will exercise its authority under H.B. 2534 to annex the Nation's land immediately after July 19, 2011.  Where "threatened action by *government* is concerned," plaintiffs need not leave themselves exposed, but instead may bring "suit to challenge the basis for the threat – for example, the constitutionality of a law threatened to be enforced."  *MedImmune*, 546 U.S. at 129 (emphasis in original); *see Gonzales v. Carhart*, 550 U.S. 124, 166 (2007) (a preenforcement, as-applied challenge to a law may be maintained where it presents a "discrete and well-defined" application of the law that is "likely to occur").  That is precisely the case here.

## II.    Preemption (Count One).

The Supreme Court of the United States Constitution provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. Art. VI cl. 2.  Under this clause, "Congress has the power to preempt state law."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  Indeed, as the Supreme Court confirmed only days ago, "[t]he Supremacy Clause, on its face, makes federal law 'the supreme Law of the Land' even absent an express statement by Congress."  *Pliva, Inc. v. Mensing*, --- S. Ct. ---, 2011 WL 2472790, at *10 (June 23, 2011),

The preemption doctrine consists of three well-recognized classes: express, field, and conflict preemption.  Conflict preemption comes in two forms, impossibility and obstacle preemption.  *See id.* at 372-73.  Obstacle preemption arises when a challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.  *Id.* at 373.  The Nation asserts obstacle preemption, arguing that H.B. 2534 seeks to nullify the Gila Bend Act, upsets the balance Congress struck in the Act, and imposes discriminatory burdens on the exercise of federal rights granted in the Act.  Docs. 23 at 19-24, 30 at 10.

Two cornerstones of preemption jurisprudence must guide the Court's analysis of this claim. *Wyeth v. Levine*, 129 S. Ct. 1187, 1194 (2009). First, the "'purpose of Congress is the ultimate touchstone' in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (citations omitted). Second, in "all pre-emption cases, and particularly those in which Congress has 'legislated in a field which the States have traditionally occupied,' [courts] 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The Court will address Congress' purposes in the Gila Bend Act below, but first will consider whether the presumption against preemption applies.

### A.     Presumption Against Preemption.

Supreme Court and the Ninth Circuit cases are not entirely clear when addressing the presumption against preemption. The Supreme Court's opinion in *Wyeth* explained that the presumption applies in "*all* pre-emption cases, and particularly those in which Congress has legislated in a field which the States have traditionally occupied." *Id.* (quotation makes and citations omitted, emphasis added). *Wyeth* explained that "[w]e rely on the presumption because respect for the States as 'independent sovereigns in our federal system' leads us to assume that 'Congress does not cavalierly pre-empt state-law causes of action.'" *Id.* at 1195 n. 3 (quoting *Medtronic,* 518 U.S. at 485). *Wyeth* explained that the applicability of the presumption does not depend "on the absence of federal regulation." *Id.*

A few years earlier, in *United States v. Locke*, 529 U.S. 89 (2000), the Supreme Court provided different guidance. *Locke* stated that the presumption "is not triggered when the State regulates in an area where there has been a history of significant federal presence." *Id.* at 108. Noting that the state laws in question bore upon national and international maritime commerce – matters traditionally subject to federal regulation – *Locke* held "there is no beginning assumption that concurrent regulation by the State is a

valid exercise of its police powers." *Id*. Thus, *Wyeth* states that the presumption applies in "all" cases, and *Locke* states that it does not apply in areas traditionally subject to federal regulation.[3]

Ninth Circuit cases appear to have perpetuated this dichotomy. In *Pacific Merchant Shipping Ass'n v. Goldstene*, --- F.3d ---, 2011 WL 1108201 (9th Cir. Mar. 28, 2011), the Ninth Circuit recognized the statement in *Locke*, but characterized *Wyeth* as "further explain[ing] the proper scope of this presumption against preemption." *Id*. at *9. Noting that States historically have regulated air pollution, the Ninth Circuit applied the presumption notwithstanding the fact that Congress has also historically regulated air pollution. *Id*. Other Ninth Circuit cases, by contrast, have followed *Locke* and declined to apply the presumption in areas with a "history of significant federal presence." *See United States v. Arizona*, --- F.3d ----, 2011 WL 1346954, at *11 n.16 (9th Cir. Apr. 11, 2011) (immigration); *In re Korean Air Lines Co.*, --- F.3d ----, 2011 WL 1458794, at *4 n.6 (9th Cir. Apr. 18, 2011) (navigable air space).

For two reasons, the Court concludes that the presumption against preemption applies in this case. First, the Supreme Court's most recent non-plurality pronouncement states that the presumption applies in "all" cases. *Wyeth*, 129 S. Ct. at 1194. Second, H.B. 2534 ultimately implicates a city's authority to extend its corporate limits through annexation, an area of law historically subject to state regulation. *Pacific Merchant*, 2011 WL 1108201, at *10.

The Nation argues that the subject addressed in H.B. 2534 is not municipal annexation, but tribal land acquisitions – an area traditionally reserved for federal

---

[3] The confusion over the presumption continues. In the *Pliva* case handed down last week, a four-member plurality of the Supreme Court did not apply the presumption and instead concluded that the Supremacy Clause suggests that "federal law should be understood to impliedly repeal conflicting state law" and "courts should not strain to find ways to reconcile federal law with seemingly conflicting state law." 2011 WL 2472790 at *10. Four dissenting justices took issue with this approach, noting that "[f]or more than half a century, we have directed courts to presume that congressional action does *not* supersede 'the historic police powers of the States unless that was the clear and manifest purpose of Congress.'" *Id*. at *21 (quoting *Rice*, 331 U.S. at 230 (emphasis in original)).

regulation.  The Nation bases this argument on the fact that annexation under H.B. 2534 can occur only when a landowner has "submitted a request to the federal government to take ownership of the territory or hold the territory in trust."  A.R.S. § 9-471.04(A)(1).  Thus, the Nation argues, the bill applies only when a tribe has requested that land be taken into trust and therefore clearly seeks to regulate Indian affairs.

Although it is true that the bill applies only when a request has been made to the federal government, the triggering requests are not limited to Indian land matters.  The powers of H.B. 2534 are triggered not only by a request to hold land "in trust" for a tribe, but also by a request that the federal government "take ownership" of land pursuant to a federal statute or regulation.  *Id.*  Thus, for example, a proposal to exchange private land for federal land, which necessarily would include a request that the federal government "take ownership" of the private land, would appear to trigger H.B. 2534.  *See*, *e.g.*, *Greer Coalition. Inc. v. United States Forest Service*, No. CV 09-8239-PCT-DGC, 2011 WL 671750 (D. Ariz. Feb. 16, 2011) (proposal to exchange private land for federal land under the Federal Land Policy Management Act).  The Court therefore cannot conclude that the application of H.B. 2534 is limited to tribal land acquisitions.

In addition, courts have looked to the broader purposes of a state statute when deciding whether it concerns matters of historical federal regulation.  For example, the state rules at issue in *Pacific Merchant* concerned fuels used in maritime vessels, an area historically subject to federal regulation, and yet the Ninth Circuit looked more broadly and held that the state rules "ultimately implicate" air pollution, a matter of historical state regulation.  2011 WL 1108201 at *10.  Similarly, although H.B. 2534 certainly can be used to affect tribal acquisition of land surrounded by a municipality, its overarching goal is to preserve the municipality's control of land within its boundaries, a matter historically regulated by states.  The presumption applies to such traditional state matters.

Cases relied on by the Nation are not persuasive.  *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), involved the application of state taxes to activities on an

Indian reservation.  *Id.* at 138, 144.  Traditional preemption analysis was unhelpful because whether the exercise of state authority over reservation activities would violate federal law "called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake[.]"  *Id.* at 145.  Nothing in H.B. 2534 purports to tax or otherwise regulate activities on existing reservation land.[4]

In summary, the Court concludes that the presumption against preemption applies. As a result, the Gila Bend Act preempts H.B. 2534 only if preemption was "the clear and manifest purpose of Congress."  *Wyeth*, 129 S. Ct. at 1194.

**B.     Preemption Analysis.**

As already noted, obstacle preemption exists where, under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see Perez v. Campbell*, 402 U.S. 637, 649-50 (1971) (collecting cases to show that since *Hines* the Supreme Court has "adhered to this meaning of the Supremacy Clause").  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects[.]"  *Crosby*, 530 U.S. at 373.

**1.     Congressional Purpose in the Gila Bend Act.**

Congressional purpose primarily is discerned from the language of the statute itself.  *Medtronic*, 518 U.S. at 486.  Also relevant, however, is the "'structure and purpose of the statute as a whole,' as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute" to operate.  *Id.*  Stated differently, "'when the question is whether a Federal act overrides state law, the entire scheme of the statute must of course be considered and that which

---

[4] The Nation also argues that the presumption does not apply because H.B. 2534 is discriminatory (Doc. 30 at 12), but the cases cited by the Nation do not support this argument.  *Malabed v. N. Slope Borough*, 335 F.3d 864 (9th Cir. 2003), recognized the presumption.  *Id.* at 869.  *Cabazon Band of Mission Indians v. Smith*, 388 F.3d 691 (9th Cir. 2004), did not discuss the presumption.

needs must be implied is of no less force than that which is expressed.'" *Crosby*, 530 U.S. at 373 (quoting *Savage*, 225 U.S. at 533).

The O'odham (formerly the Papago) lived for centuries along the banks of the Gila River in southwestern Arizona.  In 1882, the federal government established for the O'odham people a 22,000-acre reservation near Gila Bend, Arizona.  The reservation was reduced to roughly 10,000 acres in 1909.

In 1960, the federal government completed construction of Painted Rock Dam ten miles downstream from the reservation.  The dam was built to provide flood protection for the City of Yuma and others living south of the reservation.  The O'odham were told that flooding from the dam would occur infrequently and would not impair their ability to farm reservation land, but flooding between 1978 and 1984 far exceeded the projections made when the dam was built.  Floodwaters destroyed a large farm developed at tribal expense and precluded all economic use of reservation lands.  As a result, the O'odham people were "desperate for a land base that [could] provide them realistic and reasonable opportunities for economic and social development."  H.R. Rep. 99-851, at 7 (1986).

Recognizing the United States' responsibility for the plight of the O'odham people, and its responsibility "to exercise its plenary power over Indian affairs to find an alternative land base for the O'odham people," Congress enacted Section 308 of the Southern Arizona Water Rights Settlement Act (the "Settlement Act"), Pub. L. No. 97-293, 96 Stat. 1261 (Oct. 12, 1982).  That section directed the Secretary of the Interior to exchange federal lands for those of the Gila Bend reservation which he determined were unsuitable for agriculture due to flooding.  Studies completed in 1983 and 1986 concluded that reservation lands had little or no economic value, and no lands existed within a 100-mile radius of the reservation which were suitable for agriculture or otherwise acceptable to the Nation on a socio-economic basis.

Rather than litigating a variety of potential legal claims against the United States, the Nation pursued a legislative remedy which resulted in passage of the Gila Bend Act.

The House Report makes clear that the legislation, like Section 308 of the Settlement Act, was premised on the "responsibility of the United States, as trustee, to take action to resolve the tribe's immediate problem of an utterly uneconomic land base" and the "pressing problems of the O'odham at Gila Bend."   H.R. Rep. 99-851, at 9.   The "principal purpose" of the legislation was "to provide suitable alternative lands and economic opportunity for the tribe."  *Id.* at 9.

The Act seeks to accomplish this goal by "facilitat[ing] replacement of reservation lands" with lands that, among other things, "promote the economic self-sufficiency of the O'odham people."  *Id.* at 3-4; Pub. L. No. 99-503, § (2)(4).  The Nation is authorized to use funds provided under the Act to "acquire by purchase private lands."  Pub. L. No. 99-503, § 6(c).  Congress specifically intended that the Nation have "great flexibility" in determining the use of those funds.  H.R. Rep. 99-851, at 10.

This general purpose of the Gila Bend Act does not resolve the preemption question in this case.  Although it is clear that Congress intended to provide the Nation with power to acquire reservation lands that would promote economic self-sufficiency, Congress also clearly intended to avoid the creation of reservation lands within existing cities or towns.  As discussed at some length in a related decision of this Court, the Act specifies that new reservation land may not fall "within the corporate limits" of a city or town.  *Gila River*, --- F. Supp. 2d ---, 2011 WL 826282 at *5-11.  The Act does not purport to regulate how cities or towns may incorporate land; that process is left entirely to Arizona law.  Thus, the mere fact that Congress intended to provide the Nation with power to acquire new reservation lands that would promote economic self-sufficiency, and even intended the Nation to have great flexibility in making these acquisitions, does not show that Congress intended to override the annexation decisions of Arizona cities and towns.  To the contrary, the Act respects those decisions by providing that the Nation cannot acquire land within the corporate limits of a city or town.  The Court therefore cannot conclude from the general purposes of the Gila Bend Act that H.B. 2534 – which

1 constitutes a duly enacted state law regulating annexation by cities and towns – conflicts

2 with the Act.  The Court must look to the operation of the Act to determine whether H.B.

3 2534 presents a significant obstacle to the intent of Congress.

4 **2.      Operation of the Gila Bend Act.**

5 The key provision of the Act for purposes of preemption analysis is § 6(d).  The

6 relevant portions of that section read as follows:

> The Secretary, at the request of the Tribe, shall hold in trust for the benefit
> of the Tribe any land . . . which meets the requirements of this subsection.
> Any land which the Secretary holds in trust shall be deemed to be a Federal
> Indian Reservation for all purposes.  Land does not meet the requirements
> of this subsection if it is outside the counties of Maricopa, Pinal, and Pima,
> Arizona, or within the corporate limits of any city or town.

12 Pub. L. No. 99-503, § 6(d).

13 Several Congressional purposes are evident from this language.  First, Congress

14 states that the Secretary of the Interior "shall" hold land in trust for the Nation if the

15 requirements of § 6(d) are satisfied.  The statute is mandatory, unlike other statutes

16 authorizing acquisition of Indian trust lands.  *See*, *e.g.*, 25 U.S.C. § 465 (authorizing

17 Secretary, "in his discretion," to acquire trust lands).  Second, the point at which the

18 Secretary acquires this mandatory obligation is "at the request of the Tribe," provided the

19 requirements of the section are satisfied.  No other point in time is specified in § 6(d).

20 Third, land acquired by the Nation does not satisfy the requirements of § 6(d) if the land

21 "is" within the corporate limits of any city or town.  The use of the present tense "is"

22 suggests that the land must not be within corporate limits when the triggering event

23 occurs – when the request is made by the Nation to the Secretary.  Thus, Congress'

24 intent with respect to the operation of Gila Band Act can be summarized as follow:  when the

25 Nation asks DOI to take land into trust that is not at that time within the corporate limits

26 of any city or town, DOI has a mandatory obligation to take the land into trust provided

27 the other requirements of § 6(d) – not relevant here – are satisfied.  Stated differently,

28

Congress mandated that land be taken into trust once a request was made by the Nation with respect to qualifying land.

As part of their due process argument, Defendants contend that DOI is not under a mandatory duty to take land into trust once a request is made, or even after a DOI decision to take land into trust has been made. Defendants argue that DOI reserves the right to reconsider trust decisions, that liens must be cleared before land finally is taken into trust, and that the Nation does not acquire a vested right in property until documents are signed actually taking the property into trust. Doc. 32 at 16-17. Even assuming all of these points to be true, none of them disproves the clear intent of Congress expressed in § 6(d) – that DOI "shall" take land into trust "at the request of the Tribe" if the land "meets the requirements of this subsection." Pub. L. No. 99-503, § 6(d). It may be true that DOI has authority to reconsider the question of whether land meets all of the requirements of the Act. It may also be true that land will not be taken into trust if it is subject to existing liens. *See Tohono O'odham Nation v. BIA*, 22 I.B.I.A. 220, 237 (1992). But the fact that DOI must ensure that the land satisfies the requirements of the Gila Bend Act and can be conveyed with clear title does not alter the fact that Congress said DOI "shall" take the land into trust if these requirements are met. Nor does it alter the fact that the only date § 6(d) identifies for assessing this duty is "at the request of the Tribe."

To summarize, Congress clearly mandated that land be taken into trust upon request of the Tribe if the requirements of the Act – and presumably the fundamental real estate requirement of clear title – are satisfied. Congress did not make the decision discretionary as it has done in other statutes. *See* 25 U.S.C. § 465. Congress did not mandate that DOI confer with state and local governments as is required by DOI regulations for discretionary acquisitions. See 25 C.F.R. § 151.11(d).[5] In this case,

---

[5] This regulation provides that "[u]pon receipt of a tribe's written request to have lands taken in trust, the Secretary shall notify the state and local governments having regulatory jurisdiction over the land to be acquired. The notice shall inform the state and

- 14 -

Defendants do not argue that the requirements of the Act have not been satisfied or that the Nation is unable to convey clear title.[6]   Defendants thus have identified no impediment to Congress' mandate that the Nation's land be taken into trust.   The question, then, is whether the application of H.B. 2534 to the Nation's land would stand as an obstacle to that mandate.

### 3.   Does H.B. 2534 Conflict With the Purposes of the Act?

The Nation filed an application on January 28, 2009, requesting that DOI take the Nation's land into trust.  On that date, the property was not within the corporate limits of Glendale and Defendants do not contend that the land otherwise failed to satisfy the requirements of § 6(d).  Thus, as of January 28, 2009, Congress' intent under the Gila Bend Act was that the land be taken into trust.

H.B. 2534 clearly conflicts with this Congressional intent.  The bill was enacted in 2011, long after DOI's obligation to take the land into trust arose.  H.B. 2534's clear purpose and effect would be to block DOI from taking the land into trust, contrary to the express command of Congress.  Application of H.B. 2534 to the Nation's land thus would stand as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hines*, 312 U.S. at 67.

With respect to Parcel 2, DOI specifically found on July 23, 2010, that the legal requirements under Gila Bend Act had been satisfied.  Doc. 23-4; *see* 75 Fed. Reg. 52550-01, 52550-51 (Aug. 26, 2010).  DOI found that Parcel 2 was not "within the corporate limits" of Glendale because the City "has never annexed Parcel 2[.]"  Doc. 23-4

---

local government that each will be given 30 days in which to provide written comment as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments."   25 C.F.R. § 151.11(d).  Congress could have imposed similar requirements in the Gila Bend Act, and yet neither made the Act discretionary nor imposed an obligation for DOI to confer with state and local governments.  Congress instead stated that DOI "shall" take the land into trust if the requirements of § 6(d) are satisfied.

[6] Defendants did argue in a related case that the requirements of § 6(d) have not been satisfied with respect to the Nation's land, but the Court did not accept those arguments.  *See Gila River*, --- F. Supp. 2d ---, 2011 WL 826282.

at 6.  That decision was later affirmed by this Court.  *Gila River*, --- F. Supp. 2d ---, 2011 WL 826282.  Glendale's use of H.B. 2534 to annex Parcel 2 clearly would obstruct the command of Congress that Parcel 2 now be taken into trust.

With respect to Parcel 1 – the portion of the Nation's land which Glendale claimed to have annexed previously and that therefore became embroiled in state-court litigation – the Nation never withdrew its request that DOI take the parcel into trust.  DOI is holding the request in abeyance pending resolution of the state-court litigation.  *See* Doc. 23-4 at 2-3.  The Nation has made clear that if the state-court lawsuit is resolved in its favor, as appears likely given the state-court decisions to date, it will ask DOI to take both parcels in trust "as a single, contiguous area" pursuant to the Gila Bend Act.  *See* AR758-62.  Thus, Parcel 1 remains the subject of a request and DOI has a mandatory obligation to take the land into trust if the requirements of § 6 (d) are satisfied.  Glendale's annexation of the land under H.B. 2534 would obstruct the Act's objectives.

H.B. 2534's conflict with the Act is evident from another line of cases as well.  H.B. 2534 would cause the Nation to lose important voting and hearing opportunities that otherwise would be available under Arizona's general annexation law.  *See* A.R.S. § 9-471.  Although those opportunities are not available to the Nation as a matter of constitutional right, *see Green v. City of Tucson*, 340 F.3d 891, 896-98 (9th Cir. 2003), they are statutory rights that H.B. 2534 eliminates once the Nation has requested that its land be held in trust.  "This burdening of a federal right . . . is not the natural or permissible consequence of an otherwise neutral, uniformly applicable state [law]."  *Felder v. Casey*, 487 U.S. 131, 144 (1988).  The Nation's land is subject to annexation under H.B. 2534 specifically because the Nation has "submitted a request to the federal government" to hold the land in trust "as required by a specific federal statute[.]"  A.R.S. § 9-471.04.  Congress, of course, "would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted."  *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 33 (1996).  Because H.B. 2534

"discriminates against the precise type of [right] Congress has created" in the Gila Bend Act – that is, it denies statutory hearing and voting rights only to those who have asked the federal government to take ownership of private land or to hold the land in trust – the state statute "must yield" to the act of Congress. *Felder*, 487 U.S. at 145; *see Crosby*, 530 U.S. at 378 (state statute conflicted with federal law by "penalizing individuals and conduct that Congress has explicitly exempted or excluded from sanctions"); *Toll v. Moreno*, 458 U.S. 1, 17 (1982) (finding state tuition law preempted where, given the federal government's favorable treatment of certain aliens, the Court could not "conclude that Congress ever contemplated that a State, in the operation of a university, might impose discriminatory tuition charges and fees solely on account of the federal immigration classification").

Because application of H.B. 2534 to the Nation's land clearly would frustrate Congress' purpose in the Gila Bend Act, and would deprive the Nation of traditional annexation hearing and voting rights solely because it exercised its right under the Act, the Court must find that H.B. 2534 is preempted.  As the Supreme Court recently confirmed, "[w]here state and federal law 'directly conflict,' state law must give way." *Pliva*, --- S. Ct. ---, 2011 WL 2472790, at *8.

4. **The Purposes of H.B. 2534.**

Defendants argue that the Court must look only to the text of H.B. 2534 and not consider its legislative purpose.  Doc. 35 at 39.  Although the Court finds the text of H.B. 2534 sufficient to establish preemption, the Court's analysis need not be limited to the text.  Courts conducting preemption analysis may look to the "both the state law's *purpose* and its *effect*."  *Goodspeed Airport, LLC*, 681 F. Supp. 2d 182, 200 (D. Conn. 2010) (emphasis in original); *Sparks v. R.J. Reynolds Tobacco Co.*, No. C94-783C, 1994 WL 1618544, at *2 (W.D. Wash. Dec. 9, 1994) (same); *see English v. GE Co.*, 496 U.S. 72, 84 (1990) ("part of the pre-empted field is defined by reference to the purpose of the state law in question, [and] another part of the field is defined by the state law's actual

effect"); *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658 (1995) (looking at the "purpose and effect" of the state law).[7]

Consideration of the Arizona Legislature's purpose in H.B. 2534 confirms that the bill is subject to obstacle preemption. The Arizona Legislature clearly sought to block application of the Gila Bend Act to the Nation's property near Glendale. A lead sponsor of H.B. 2534 stated that the bill arose from the "power grab by the federal government," and that the legislature was "fighting an overreaching, intrusive federal government." Doc. 23-7 at 140-41. The legislator went on to explain that the bill "clarifies that the Gila Bend Act does not apply to county islands" – a clear indication that H.B. 2534 was intended to alter the effect of the Gila Bend Act. *Id.* at 214. One of the bill's co-sponsors stated that he was "not a big fan" of the Gila Bend Act because it allowed the Nation to "cherry pick" land and have it declared tribal land. *Id.* at 151. Another co-sponsor stated that because "the Constitution dictates that states are sovereign," the Gila Bend Act was "not the supreme law" of the land to the extent it allowed the Nation "to take sovereign land out of the state with an act of Congress." *Id.* at 19-20.

In short, the Arizona Legislature's stated purpose in passing H.B. 2534 was to block the Nation's acquisition of trust land under the Gila Bend Act. This legislative intent confirms the Court's conclusion that H.B. 2534 conflicts with the Gila Bend Act.

### C.    Preemption Conclusion.

Although the Court certainly is sympathetic to the State's desire to control annexation of municipal lands and to avoid federal acquisition of land surrounded or virtually surrounded by a city or town, particularly when the acquisition may allow

---

[7] Defendants' reliance on *Perez v. Campbell* is misplaced. In *Perez*, the Supreme Court rejected the "aberrational doctrine" that state law is not preempted so long as the state legislature had some purpose in mind other than one of frustrating federal law. 402 U.S. at 651-52. Stated differently, state legislatures cannot avoid preemption simply by publishing a legislative committee report articulating some state interest or policy other than frustration of the federal objective. *Id.* at 652. *Perez* does not stand for the proposition that the purpose of the state law is irrelevant to the question of preemption. To the contrary, the Arizona statute at issue in *Perez* impermissibly frustrated federal law because it had "both that effect and that *purpose*." *Id.* at 653 (emphasis added).

gambling in a community that strongly opposes it, the Supremacy Clause of the United States Constitution prohibits state legislatures from enacting laws that "directly conflict" with a federal statute. *Pliva*, --- S. Ct. ---, 2011 WL 2472790, at *8; *Crosby*, 530 U.S. at 372. For reasons explained above, the Court finds that H.B. 2534 directly conflicts with Congress' intent that the Nation's land be taken into trust under the Gila Bend Act. As a result, H.B. 2534 is preempted by the Act. This is true even though the analysis includes a presumption against preemption. The Court finds that the clear and manifest purpose of Congress in the Gila Bend Act is that land be taken into trust once a request is made under § 6(d) of the Act for qualifying land. H.B. 2534 clearly frustrates this purpose, and the conflict "is strong enough to overcome the presumption." *Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 716 (1985); *see also Crosby*, 530 U.S. at 374 n.8 (state law presents a "sufficient obstacle" to overcome presumption). The Court will enter summary judgment in favor of the Nation on count one.[8]

### III.    Due Process (Counts Two and Five).

The Nation claims that application of H.B. 2534 to the Nation's land would violate the Due Process Clauses of the United States and Arizona Constitutions. Doc. 1 ¶¶ 49-53, 62-64. "The federal and state due process clauses contain nearly identical language and protect the same interests." *State v. Casey*, 71 P.3d 351, 354 (Ariz. 2003). Each clause "'includes a substantive component which guards against arbitrary and capricious government action, even when the decision to take that action is made through procedures that are in themselves constitutionally adequate.'" *Halvorson v. Skagit County*, 42 F.3d 1257, 1261 (9th Cir. 1994). The Nation asserts violations of substantive

---

[8] In deciding whether the "clear and manifest purpose" of Congress is sufficient to overcome the presumption, the Court need not find a clear and manifest purpose to preempt. Indeed, divining Congress' preemption intention would rarely be possible in a conflict preemption case. The clear and manifest purpose must be a statutory purpose with which the state law conflicts. As the Supreme Court made clear in *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947), the "clear and manifest purpose of Congress" necessary to overcome the presumption is present where state law "may produce a result inconsistent with the objective of the federal statute." 331 U.S. at 23; *see City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 633 (1973) (same).

due process, not procedural due process.  *See* Doc. 30 at 21 n.11.

Where the challenged government action does not impinge on a fundamental right, such as matters relating to marriage, family, and procreation, the government action is reviewed for a "rational basis."  *Halvorson*, 42 F.3d at 1262.  Under this review, "a statute will pass constitutional muster if it is 'rationally related to a legitimate state interest.'"  *Merrifield v. Lockyer*, 547 F.3d 978, 984 n.9 (9th Cir. 2008) (quoting *City of New Orleans v. Duke*, 427 U.S. 297, 303 (1976)); *see Gadda v. State Bar of Cal.*, 511 F.3d 933, 938 (9th Cir. 2007).

H.B. 2534 passes the rational basis test.  "Arizona has a legitimate state interest not only in regulating the formation of new municipalities, but also in protecting the interests of already existing municipalities."  *Green v. City of Tucson*, 340 F.3d 891, 903 (9th Cir. 2003).  This interest includes avoiding the complications that can arise when Indian reservations or federal enclaves are created on the fringes of existing cities and towns.  Such developments "can lead to intergovernmental conflict over resources and economic development."  *Id.*  Arizona has "rationally chosen" to prevent such intergovernmental conflicts by increasing the ability of cities and towns to annex neighboring areas which may be transferred to the federal government.  *Id.*  The Court cannot conclude that H.B. 2534 is "irrational and arbitrary."  *Dodd*, 59 F.3d at 864.[9]

The Nation contends that frustrating the exercise of a federal right – the statute's purpose in this case – can never be a legitimate state objective.  Doc. 23 at 28.  But in support of this argument the Nation cites preemption cases, not due process cases.  *See Crosby*, 530 U.S. 363; *Rollins Evnt'l Servs. (FS), Inc. v. St. James Parish*, 775 F.2d 627 (5th Cir. 1985).  Indeed, the question in *Rollins* was "not so much whether the challenged [law] is rationally related to legitimate objectives, but whether it trenches impermissibly

---

[9] The Nation's reliance on *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), is misplaced.  The challenged statute in *Apfel* created a "staggering financial burden" for events that occurred decades ago, presenting one of the "rare cases" where the legislature "has exceeded the limits imposed by due process."  524 U.S. at 540, 549.

upon a field preempted by Congress."  775 F.2d at 635.

The Court finding that H.B. 2534 is preempted because it obstructs the objectives of the Gila Bend Act does not also require a finding that H.B. 2534 violates the Nation's due process rights.  The Nation has not met its burden of showing that H.B. 2534 is clearly arbitrary and unreasonable, having no relation to any legitimate state interest.  *See Dodd*, 59 F.3d at 864.  The Court therefore will grant summary judgment in favor of Defendants on counts two and five.[10]

## IV.   Equal Protection (Counts Three and Six).

The Nation claims that application of H.B. 2534 to the Nation's land would violate the Equal Protection Clauses of the United States and Arizona Constitutions.  Doc. 1 ¶¶ 54-56, 65-67.  Because the Nation alleges no fundamental right that is infringed by H.B. 2534, and because the statute's classifications are not constitutionally suspect, traditional rational basis review applies.  *See Taylor v. Rancho Santa Barbara*, 206 F.3d 932, 934 (9th Cir. 2000).  The classifications in H.B. 2534 therefore survive the Nation's equal protection challenge "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose."  *Id.* at 934-35.  Each classification "must be upheld if there is any reasonably conceivable set of facts that could provide a rational basis for the classification."  *Id.* at 935.  Stated differently, as the party attacking the rationality of the legislative classifications, the Nation "has the burden to negative every conceivable basis which might support [them]."  *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1155 (9th Cir. 2004).  The Nation has not met this burden.

The Nation claims that Defendants have presented no "conceivable legitimate governmental objective to which H.B. 2534 can be said to be rationally related."  Doc. 30 at 27.  To the contrary, protecting the ability of cities in populous counties to exercise control over properties within their boundaries, and protecting the cities' interests in not

---

[10] The parties raise other due process issues concerning retroactivity and whether the Nation possesses a property interest protected by due process.  Because H.B. 2534 clearly passes the rational basis test, the Court will not address these issues.

having such lands transferred to other sovereigns, are legitimate state interests.  *See Green*, 340 F.3d at 903.  The Nation conceded this point at the hearing.  Doc. 35 at 17.

The Nation argues that H.B. 2534 fails the rational basis test because it is limited to the State's three largest counties and therefore does not include all of the cities and towns that might have an interest in blocking federal acquisition of nearby land.  The Court does not agree, however, that complete inclusiveness is a requirement of the rational basis test.   When asked during the hearing for authority to support this requirement, the Nation cited *Eisenstadt v. Baird*, 405 U.S. 438 (1972).  Doc. 35 at 17, 35.  *Eisenstadt*, however, addressed the irrationality of the law in question, noting that there was simply no rational basis for outlawing distribution of contraceptives "to unmarried but not to married persons."  405 U.S. at 454.  As Defendants explain in their reply brief, however, each of H.B. 2534's classifications is rationally related to legitimate state interests.  *See* Doc. 32 at 21-23.

Moreover, state legislatures are not required by the Equal Protection Clause to solve all problems at once.  They "'must be allowed leeway to approach a perceived problem incrementally.'"  *RUI One Corp.*, 371 F.3d at 1155 (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 316 (1993)).  The fact that the Arizona Legislature limited H.B. 2534 to the most populous counties in Arizona does not mean that it fails the rational basis test.  As noted, it is rational to conclude that the most crowded counties have the greatest need to control land use and annexation.

H.B. 2534 survives the "very lenient" rational-basis inquiry.  *Id.*  The Court will grant summary judgment for Defendants on counts three and six.

**V.    Special Legislation (Count Four).**

The Arizona Constitution provides that "[n]o local or special laws shall be enacted . . . [w]hen a general law can be made applicable."  Ariz. Const. art. IV, pt. 2 § 19(20).  "A 'special law' confers rights and privileges on particular members of a class or to an arbitrarily drawn class that is not rationally related to a legitimate governmental

purpose, while a 'general law' applies to all persons of a reasonably defined class." *Long v. Napolitano*, 53 P.3d 172, 178 (Ariz. Ct. App. 2002).  Legislation such as H.R. 2534 that applies only in certain locations is valid where "(1) there is a rational basis for the classification; (2) the classification is legitimate, encompassing all members of the relevant class; and (3) the class is flexible, allowing members to move into and out of the class." *State Comp. Fund v. Symington*, 848 P. 2d 273, 278 (Ariz. 1993).

The Nation must establish "beyond a reasonable doubt" that H.B. 2534 constitutes special legislation.  *Long*, 53 P.3d at 179.  Arizona courts hold "a strong presumption" that statutes are constitutional, and "construe a statue so as to give it, if possible, a reasonable and constitutional meaning." *Id*.

### A.     Rational Basis.

"The special law ban does not prohibit the legislature from enacting laws that confer privileges only on a population-based class, as long as the classification is a rational one." *Id*.  The parties agree that the rational-basis analysis under this prong mirrors the analysis for the equal protection claim.  Docs. 23 at 28, 28 at 26.  As explained above, H.B. 2534 satisfies the rational basis test.

### B.     Legitimacy.

The second criterion asks whether the legislation applies equally to all in a similar situation who come within its scope.  *City of Tucson v. Woods*, 959 P.2d 394, 401 (Ariz. Ct. App. 1997).  The legislation "need not operate on every person, place or thing within the state; however, it must apply uniformly to all cases and to all members within the circumstances provided for by the law." *Republic Inv. Fund I v. Town of Surprise*, 800 P.2d 1251, 1258 (1990).  There must be a "rational reason" why the scope of the statute is limited.  *Town of Gilbert v. Maricopa County*, 141 P.3d 416, 421 (Ariz. Ct. App. 2006).

The Nation argues that H.B. 2534 does not encompass all members of the relevant class because it is limited to counties with populations in excess of 350,000, and cities in such larger counties have no greater interest in the speedy annexation of nearby land than

cities in smaller counties.  The Court does not agree.  Land use and control issues clearly are more pressing in more populated areas, and counties with larger populations have more cities in need of speedy mechanisms to control development.  H.B. 2534 provides these more crowded counties with a means for confronting urban development issues.  Because the Court finds this to be a rational reason for the classification, H.B. 2534 satisfies the second prong of the special legislation test.

### C.    Flexibility.

The final prong asks whether the classification is sufficiently flexible to allow members to move in and out of the class.  "A classification limited to a population as of a particular census or date is a typical form of defective closed class . . . because it is impossible for entities to enter or exit the class with changes in population."  *Id.* at 1259.  H.B. 2534's classification is not tied to a particular date or census.  It includes any county that reaches a population of 350,000, with no limit on when that may occur.  The question, therefore, is "whether there is an actual probability that the legislation will eventually apply to other [counties]."  *Town of Gilbert*, 141 P.3d at 422.

The Nation argues that the legislation is not flexible because, according to the most recent census trends, no other counties will qualify under H.B. 2534 for thirty years.  Arizona case law suggests, however, that a classification is not inflexible simply because it will take time for other members to enter or exit the class.  *See Town of Gilbert*, 141 P.3d at 422 ("The question becomes whether there is an actual probability that the legislation will *eventually* apply to other county islands." (emphasis added)); *Long*, 53 P.3d at 183 (upholding a statute with a population-based classification requiring more than two million people even though the statute at the time applied only to one county); *Republic Inv. Fund I*, 800 P.2d at 1258 (statute "'must be such that other municipalities may, upon the attainment of the conditions characterizing any particular class, enter that class, and the conditions themselves must be not only possible, but reasonably probable, of attainment.'" (quoting *Petitioners for Deannexation v. City of Goodyear*, 773 P.2d

1026, 1030 (Ariz. Ct. App. 1989)).  Given the historical growth of Arizona and the Southwest, the Court concludes that there is an actual probability that other counties will reach the population threshold of the statute, not merely a theoretical possibility.

The Nation argues that no other county will ever qualify for the benefits of H.B. 2534 because the Gila Bend Act permits the Nation to acquire land only in the three most populous counties in the State and no other federal law will permit such acquisitions in other counties.  As the Nation's counsel conceded at oral argument, however, Indian tribes in smaller counties could request that land be taken into trust under the discretionary trust-acquisition statute.  25 U.S.C. § 465.  Because those counties can come within the provisions of H.B. 2534 as they grow in population, the classifications in the bill are not inflexible.

The Nation has not shown beyond a reasonable doubt that H.B. 2534 constitutes special legislation.  The Court therefore will grant summary judgment in favor of Defendants on count four.

**IT IS ORDERED:**

1.     The motions for summary judgment (Docs. 23, 28) are **granted in part** and **denied in part**.  Summary judgment is granted in favor of Plaintiff on the preemption claim asserted in count one, and in favor of Defendants on counts two through six.

2.     The Court declares that H.B. 2534, as applied in this case, is preempted by the Gila Bend Act, Pub. L. No. 99-503, 100 Stat. 1798 (Oct. 20, 1986).

3.     The Clerk is directed to enter judgment accordingly.

Dated this 30th day of June, 2011.

David G. Campbell
United States District Judge